# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 5, 2023

Lyle W. Cayce
Clerk

No. 21-60889

Shrimpers and Fishermen of the RGV; Sierra Club; Save RGV from LNG,

*Petitioners*,

*versus*

United States Army Corps of Engineers; Colonel Timothy R. Vail, *in his official capacity as Galveston District Commander, U.S. Army Corps of Engineers*; Robert W. Heinly, *in his official capacity as Deputy Chief, Regulatory Division, Galveston District, U.S. Army Corps of Engineers*,

*Respondents*.

---

Petition for Review of an Order of
the United States Army Corps of Engineers
Agency No. SWG-2015-00114

---

Before King, Duncan, and Engelhardt, *Circuit Judges*.

King, *Circuit Judge*:

Petitioners challenge a Clean Water Act permit issued by the U.S. Army Corps of Engineers authorizing the development of a natural gas pipeline and export facility in south Texas. Because the Corps approved the least environmentally damaging practicable alternative presented before it during the permitting process and did not act arbitrarily in its evaluation of

No. 21-60889

pipeline construction impacts and mitigation efforts, the petition for review is DENIED.

## I.

Petitioners Shrimpers and Fishermen of the RGV, Sierra Club, and Save RGV from LNG (collectively, "Petitioners") challenge the issuance of a Clean Water Act ("CWA") permit by the U.S. Army Corps of Engineers (the "Corps").

In 2016, Rio Grande LNG and Rio Bravo Pipeline Company (the "Developers") filed an application proposing to build a natural gas pipeline system and liquified natural gas ("LNG") export facility in south Texas, partially upon wetland terrain. The Federal Energy Regulatory Commission ("FERC") approved the project in 2019 after preparing an environmental impact statement ("EIS") examining alternative terminal placement and pipeline configurations and soliciting public comment. The Corps then issued a CWA permit to the Developers in 2020 following an evaluation of the FERC EIS, its own environmental assessment, and other relevant information.

The Developers' proposal contemplated the creation of an LNG terminal with six liquefaction "trains," which are equipment systems that cool and liquify natural gas, to produce a nominal capacity of approximately 27 million tons per annum of LNG. Under this proposal, the trains would be located sequentially, with Train 1 located on the eastern side of the terminal and Train 6 located on its west. Ground flares, used in emergency scenarios to safely depressurize LNG trains, would be positioned between Trains 2 and 3. The terminal would receive natural gas via a pipeline system comprising two parallel pipelines with capacity to provide about 4.5 billion cubic feet per day (Bcf/d) of gas. Other onsite facilities were to include four LNG storage

No. 21-60889

tanks, docking and truck loading facilities, and one of three required compressor stations.[1]

Petitioners challenged the Corps' issuance of the permit in this court, *see Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Eng'rs*, 849 F. App'x 459 (5th Cir. 2021), but we held their petition in abeyance because the Developers had changed the project design and the Corps had suspended the permit for reconsideration.[2] The Developers had modified their project proposal in April 2020 to eliminate two compressor stations, increase the length and operating conditions of the pipelines, and use five liquefaction trains instead of six, among other changes not relevant here. *Id.* at 461. The modified design requires the Developers to permanently dredge or fill 149.7 acres of special aquatic sites and to temporarily impact another 122.7 acres of special aquatic sites during pipeline construction.

The FERC approved the terminal changes, including the elimination of Train 6, and denied rehearing. The Corps considered the Developers' materials, public comments, and the FERC's assessment of the proposed changes before issuing a modified CWA permit in 2021, which Petitioners now challenge.

## II.

Petitioners allege that the Corps' permit issuance violated the CWA and its implementing regulations by, *first*, failing to show that the approved

---

[1] The application located the other two compressor stations upland and beyond the terminal's boundaries.

[2] Petitioners Sierra Club and Save RGV from LNG also challenged the FERC's original 2019 authorization in the D.C. Circuit, which held that the FERC's analyses of greenhouse gas emissions and environmental justice were deficient. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021). Those claims are not before us and do not impact the issues presented here.

project was the least environmentally damaging practicable alternative ("LEDPA") as required under 40 C.F.R. § 230.10(a) and, *second*, concluding that the wetland impacts caused by pipeline construction did not necessitate compensatory mitigation.

The CWA generally prohibits the discharge of pollutants, such as sand, dirt, and rock, into waters of the United States. 33 U.S.C. §§ 1311(a), 1362(6). This includes wetlands. 40 C.F.R. § 230.3(b). However, section 404 of the CWA allows the Corps to issue permits for the discharge of dredged or fill material into United States waters, subject to guidelines developed by the Environmental Protection Agency. 33 U.S.C. § 1344. These guidelines provide a three-step framework that the Corps must follow when issuing permits. First, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). An alternative is "practicable" if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes" and may include "area[s] not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity." *Id.* § 230.10(a)(2). Second, no permits shall issue "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts." *Id.* § 230.10(d). Third, compensatory mitigation is required for unavoidable environmental losses, based on a determination regarding what is practicable and capable of compensating for lost aquatic resource functions. 33 C.F.R. § 332.3(a)(1).

A court must set aside the Corps' permit if its issuance was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Buttrey v. United States*, 690 F.2d 1170, 1183 (5th Cir.

1982). Provided that the Corps "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action" such that its "decision was based on a consideration of the relevant factors," this requirement is satisfied. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013)). In other words, the petition should be denied if the Corps' path to permit approval "may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted).

## III.

Petitioners put forward several alternative proposals for the terminal layout and the pipeline system, arguing that the Corps failed to clearly demonstrate that the approved project—and not one or more of these alternatives—is the LEDPA required under the first step of the CWA framework.

With respect to the terminal layout, at issue is whether the twenty-acre space previously designated for westernmost Train 6, which the Developers now intend to use for storage and other construction purposes, could instead be utilized to reconfigure the terminal layout in ways that are both less environmentally damaging and practicable. The first alternative Petitioners offer contemplates shifting the ground flares and Trains 3, 4, and 5 west, such that Train 5 would occupy the footprint previously occupied by Train 6, and the ground flares would no longer sit upon five acres of wetlands. During the permitting process, the Corps considered and rejected this alternative as neither practicable nor less environmentally damaging than the proposed project. Petitioners assert that the permitted project results in the total loss of five acres of wetlands, whereas their proposed alternative only *impairs* those five acres—a less environmentally damaging result. They also

contend that this alternative, which requires their proposed Train 5 location to be used as a temporary storage and preservation area prior to the installation of Train 5, is practicable.

This alternative fails, however, because the Corps sufficiently explained that it would result in the same functional impairment of wetlands as the permitted design and thus was not the LEDPA. There is no dispute that this alternative would shift the ground flares westward such that approximately five acres of wetlands could be avoided; rather, the parties dispute how those five acres would be affected by the rest of the project under the alternative design. As the Corps explained in an addendum to its environmental assessment of the Developers' proposal, the rest of the wetlands would remain permanently filled such that the unfilled five acres of wetlands would become isolated. Moreover, the Corps found that the construction surrounding these five acres would adversely impact the hydrology of the area severely enough that the remaining wetlands would experience loss of function and degradation. Petitioners contend that this loss of function is partial, not total, but the record suggests otherwise. After evaluating "whether shifting of the remaining trains could increase avoidance of impacts to wetlands" under Petitioners' proposed alternative, the Corps determined that "potential shifting of the remaining trains [3, 4, and 5] and ground flares would not result in the avoidance of wetland function losses" compared to the permitted project. Because an alternative must both be practicable and less environmentally damaging, the failure of this alternative to satisfy the latter requirement was sufficient reason alone for the Corps to reject it.

Lacking evidence to support their view of the record, Petitioners argue that the Corps has not undergone satisfactory analysis regarding the degree of wetland impairment under their alternative. They argue the Corps is required to rebut the "very strong" presumption that impaired wetlands are

preferable to no wetlands and has not done so. *Buttrey*, 690 F.2d at 1180. But the law only requires that the Corps begins its analysis with a very strong presumption that "unnecessary alteration or destruction of [wetlands] should be discouraged as contrary to the public interest." *Id.* (quoting 33 C.F.R. § 320.4(b)(1)). Neither Petitioners nor the record suggest that the Corps did not start the permitting process with this in mind—in fact, the record suggests the opposite—and we therefore discard this argument. Accordingly, Petitioners' first proposed alternative is not the LEDPA.

Petitioners present a second alternative to the terminal design: shifting all trains west, with Train 5 again occupying the Train 6 footprint, and moving terminal support infrastructure to the Train 1 footprint. However, it is not clear that Petitioners ever proposed this alternative during the permitting process. Where, as here, the parties challenge the Corps' adequate consideration of alternatives, they "must structure their participation to alert the agency to their position in order 'to allow the agency to give the issue meaningful consideration,' unless a flaw is so obvious that there is no need to point out the shortcoming." *Gulf Coast Rod, Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, 676 F. App'x 245, 251 (5th Cir. 2017) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004)). Generally, this means raising the alternative in the comments addressed to the agency. *Pub. Citizen*, 541 U.S. at 764–65.

Petitioners direct us toward two comments submitted to the Corps that supposedly should have alerted the Corps of this alternative. As an initial matter, these comments were submitted in response to the *originally* permitted design, not the design at issue in this case. More importantly, they do not recommend this second alternative Petitioners now suggest. They propose generally "reduc[ing] the terminal footprint" by "omit[ting] one of the six planned liquefaction trains" (which the Developers have done), "adopt[ing] a more compact design with the same capacity and number of

trains" (i.e., six trains), and "mov[ing] the six liquefaction trains and associated equipment to a different and upland site." None of these proposals is sufficiently similar to Petitioners' proposed alternative to allow the Corps to give the issue meaningful consideration, and the supposed flaw in the permitted project is not so obvious that there is no need to point it out. Rather, Petitioners now propose a significant project redesign without providing the Corps an earlier opportunity to meaningfully consider it. We need not evaluate it now, and we choose not to do so.

Petitioners also propose an alternative configuration for the pipeline system, stating that the Developers should substitute the existing Valley Crossing Pipeline ("VCP") for the second proposed Rio Bravo Pipeline ("Pipeline 2"). The VCP is an existing pipeline designed to transport 2.6 Bcf/d of gas, and it follows a similar route as the permitted first Rio Bravo Pipeline ("Pipeline 1") and Pipeline 2. Several years ago, there were plans to modify the VCP to increase its capacity by at least 0.9 Bcf/d, but that project was withdrawn in March 2021 before any modifications occurred. Petitioners claim that the Developers could now meet their project purpose with only a single Rio Bravo Pipeline, utilizing the previously planned—but not realized—additional VCP capacity to provide 0.9 Bcf/d of gas and supplying the remaining 3.6 Bcf/d using Pipeline 1.

The Corps considered and rejected this alternative on the merits, but Petitioners dispute the Corps' finding that the VCP is impracticable. The practicability inquiry concerns "cost, existing technology, and logistics in light of overall project purposes," 40 C.F.R. § 230.10(a)(2), all of which the Corps explained make the VCP an impracticable alternative. Most of the issues with this alternative stem from the inability of the VCP, even assuming an expansion, to supply the 1.9 Bcf/d of gas Pipeline 2 is designed to provide. Absent such an expansion, the VCP's current capacity is fully subscribed to end users in Mexico, so any gas it could provide to the permitted project

would be on an interruptible basis only. This alone frustrates the project's purpose, which presumes a consistent supply of gas. Importantly, the supposed expansion does not currently exist and would require the VCP system itself to be redesigned, including the construction of a second pipeline to supply the necessary capacity. This redesign would result in a transportation service rate that is more than forty percent more expensive than under the permitted Pipeline 2.

Assuming the 0.9 Bcf/d expansion occurs, problems remain. To meet the pipelines' purpose of delivering 4.5 Bcf/d of gas to the terminal, Pipeline 1's capacity would have to be expanded, and compression and booster stations would have to be added to the project design. Moreover, removing Pipeline 2 would create significant logistical problems regarding maintenance, reliability, and safety. As the FERC explained, a dual pipeline system allows natural gas to be transported "reliably and safely" and in a way that supports "flexible operation to adapt to" unforeseen circumstances. *Rio Grande LNG, LLC & Rio Bravo Pipeline Company, LLC*, 170 FERC ¶ 61,046, ¶ 25 (Jan. 23, 2020) (order on rehearing and stay). The current dual pipeline will supply, at a minimum, two liquefaction trains when one pipeline is shut down, enabling flexible operation and safe, reliable transportation. Under Petitioners' proposal, that becomes one train, which the Corps states will impair terminal operations when Pipeline 1 is offline for any reason.

In addition to these problems, the VCP alternative is impracticable because it is not available. 40 C.F.R. § 230.10(a)(2) ("An alternative is practicable if it is available . . . ."). The VCP and Rio Bravo are owned by different companies, albeit both companies are wholly owned subsidiaries of Enbridge Inc. Neither Rio Bravo nor Enbridge has any contracted-for capacity on the VCP, and there is nothing in the record to suggest that the Developers can demand that the VCP become a project applicant and expand the pipeline as Petitioners propose. While "an area not presently owned by

No. 21-60889

the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered," *id.* § 230.10(a)(2), "[a] mere, unsupported theoretical possibility of acquiring the alternative site . . . does not constitute a showing that the alternative site is reasonably obtainable," *City of Shoreacres v. Waterworth*, 420 F.3d 440, 449 (5th Cir. 2005). During the comment period and now, Petitioners wholly fail to substantiate their argument that the VCP could be acquired by the Developers, and the Corps reasonably determined that it was not readily obtainable. Taken together, these factors are sufficient to support the Corps' decision to discard this alternative.

The Corps has satisfactorily explained its reasons for rejecting the alternatives previously presented to it and more than met the "minimal standards of rationality" required of our review. *Waterworth*, 420 F.3d at 445 (quoting *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983)). Accordingly, the permitted project is the LEDPA.

## IV.

Petitioners argue that the Corps acted arbitrarily when it determined that impacts to wetlands caused by pipeline construction were temporary and did not necessitate compensatory mitigation under the third step of the CWA framework. Specifically, they assert that the Corps failed to provide a factually supported estimate of the duration of wetland disruption and did not analyze the consequences of such disruption, each of which makes its decision not to require mitigation for pipeline construction impacts arbitrary.

CWA regulations require compensatory mitigation to "offset environmental losses resulting from unavoidable impacts" to wetlands authorized by the Corps' permits. 33 C.F.R. § 332.3(a)(1). However, not all wetland impacts automatically require compensatory mitigation. With respect to *temporary* impacts, the Corps' "[d]istrict engineers will determine

appropriate compensatory mitigation requirements for temporary impacts." *Compensatory Mitigation for Losses of Aquatic Resources*, 73 Fed. Reg. 19,594, 19,638 (Apr. 10, 2008). "What constitutes a temporary impact, and the need for compensatory mitigation, is determined on a case-by-case basis, depending on the specific circumstances of the project. The district engineer will determine the appropriate time interval for distinguishing between temporary and permanent impacts." *Id.* at 19,607.

Here, the Corps determined that the pipeline construction impacts would be temporary and did not require compensatory mitigation. Under the project design, the pipelines will be constructed in sequence and part-by-part, with an eighteen-month gap between the completion of Pipeline 1 and the beginning of construction of Pipeline 2. In addition, the permit imposes significant requirements on the Developers to avoid and minimize wetland impacts, such as the requirement to use horizontal drilling to avoid impacts to major waterbody crossings and other wetland areas. The permit also provides for short construction periods. Pipeline installation activities on wetlands or water crossings are estimated to take three months at most, with many shorter crossings being completed more quickly. Other construction activities require even less time. The Corps determined that these permit conditions would result in the restoration of hydric soil and wetland hydrology functions within thirty days of work completion for each waterbody crossing. The Corps further determined, based on myriad scientific evidence, including microbial activity, flooding and soil saturation duration, and soil temperature, that vegetation would be restored within one growing season from the time of restoration. Given its estimation that it would take only one growing season to revegetate the restored areas, the Corps—in accordance with its typical policy—found the impacts temporary and determined compensatory mitigation was not required.

No. 21-60889

Petitioners' first set of arguments centers on the Corps' estimation that restoration will occur within one year. They state that the Corps did not consider the full construction period when quantifying the duration of impacts, which they allege is improper. However, they supply no evidence that the construction period must be, or even that it typically is, included when assessing whether impacts are temporary. The only evidence we have is the regulation itself, which provides that the Corps' engineer "determine[s] the appropriate time interval for distinguishing between temporary and permanent impacts." *Id.* Petitioners suggest the Corps' approach could lead to absurd results in other situations, but the Corps is not bound to this approach in all instances. It is merely its typical policy, one that it chose to apply based on the "specific circumstances of the project." *Id.* Given the minimal construction period at each waterbody crossing, the Corps' decision to evaluate project impacts from the point of restoration was not improper.

Petitioners also allege that the Corps failed to demonstrate that restoration would be complete within one year and that it contradicted the conclusion reached by the EIS and endorsed by the EPA and the U.S. Fish and Wildlife Service ("FWS") that herbaceous vegetation would regenerate within one to three years.[3] These arguments are not persuasive. Based on studies showing that herbaceous wetlands restored to pre-construction contours usually revegetate within one growing season, and the fact that the project location's growing season is year-round, the Corps concluded that the project's favorable conditions would ensure successful revegetation

---

[3] Petitioners briefly suggest that the Corps failed to consider the cumulative disruption that occurs from building two pipelines in sequence. However, the Corps evaluated this disruption and determined that such impacts would be temporary regardless of consecutive pipeline construction because of the special conditions included in the permit requiring extensive restoration activities.

No. 21-60889

within one year after restoration is completed. Further, the EPA's feedback cited by Petitioners was premised on an outdated version of the proposed project prior to the modified proposal in 2020 and before the Corps had approved the compensatory mitigation plan or established the permit special conditions to avoid and minimize wetland impacts. It is not inconsistent with the Corps' ultimate conclusion. The EPA agrees that activities are typically temporary if they last "less than 12 months or a single growing season," and nowhere in the record do the EPA or the FWS state a belief that revegetation will take longer than a year. The Corps' analysis also comports with the EIS, which estimates that herbaceous vegetation will regenerate "*within* 1 to 3 years." The EIS estimation necessarily includes the finding that vegetation may revegetate in one year, as the Corps concluded. This court "must be 'most deferential' to the agency where, as here, its decision is based upon its evaluation of complex scientific data within its technical expertise." *Sierra Club v. EPA*, 939 F.3d 649, 680 (5th Cir. 2019) (quoting *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824 (5th Cir. 2003)). The Corps has satisfied our deferential review of this issue.

Lastly, Petitioners argue that the Corps failed to address whether these temporary impacts require compensatory mitigation, staking their claim primarily upon EPA comments suggesting that additional mitigation was needed.[4] However, the EPA feedback Petitioners rely upon does not consider the approved compensatory mitigation plan or the special conditions of the permit because the comments are from 2015 and 2018—

---

[4] Petitioners contend that the FWS also asserted that the pipeline construction impacts warranted compensatory mitigation but only point to notes from a 2018 interagency meeting between the FERC, the Corps, and the FWS stating, without attribution to the FWS, that mitigation "*may* be required." This does not undermine the Corps' more recent conclusion that additional mitigation is not warranted, given the conditions embedded in the permit.

well before the current permit (and even the original permit) was approved. The Corps considered this feedback and aligned its ultimate approach with the EPA's recommendations. Notably, special condition nine facilitates the Corps' monitoring of restoration efforts by requiring the Developers to submit monitoring reports within sixty days of completing construction at each crossing, and special condition ten requires the Developers to undertake additional restoration or compensatory mitigation if the Corps determines that wetlands have not been successfully restored to pre-construction conditions. Given these requirements, the Corps reasonably determined that these temporary impacts do not require compensatory mitigation. We defer to the Corps' judgment in these matters, *id.*, and we are satisfied that its decision was rational, *see Waterworth*, 420 F.3d at 445. Accordingly, we find that the Corps did not act arbitrarily in its consideration of and conclusions regarding the impacts of pipeline construction and the need for compensatory mitigation.

## V.

For the foregoing reasons, the petition for review is DENIED.