United States Court of Appeals
Fifth Circuit

**F I L E D**

June 8, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No.  05-60321

GULF RESTORATION NETWORK; SIERRA CLUB; LOUISIANA CHARTER BOAT
ASSOCIATION,

Petitioners

VERSUS

UNITED STATES DEPARTMENT OF TRANSPORTATION,

Respondent

CONOCOPHILLIPS CO.; COMPASS PORT LLC; BEACON PORT LLC; GULF
LANDING LLC,

Intervenors

PETITION FOR REVIEW OF AN ORDER OF
THE UNITED STATES DEPARTMENT OF TRANSPORTATION

Before HIGGINBOTHAM, DAVIS and STEWART, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge.

Petitioners seek review of a decision by the Secretary of

the Department of Transportation granting a license for a

liquified natural gas ("LNG") facility in the Gulf of Mexico

under the Deepwater Port Act, 33 U.S.C. § 1501 *et seq*.

Petitioners submit two issues for review.  First, they contend

that the Environmental Impact Statement ("EIS") prepared by the

Secretary as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, was deficient in that it did not adequately consider the "environmental impacts of the proposed action." More particularly, Petitioners contend the Secretary acted arbitrarily and capriciously in concluding that the effects of three potential future projects in the Gulf of Mexico were too speculative to consider in evaluating the cumulative impact of the licensing decision under NEPA. Second, Petitioners argue that the Secretary violated the Deepwater Port Act by failing to require that the proposed facility use a closed loop system, which they assert is the "best available technology to prevent or minimize adverse impact on the marine environment." For the reasons that follow, we conclude that the Secretary did not act arbitrarily or capriciously in concluding that the effects of three potential future projects were speculative in light of the uncertainty regarding whether they would be constructed, and if constructed, whether they would use an "open loop" or "closed loop" system to warm the LNG. We also conclude that the Secretary did not violate the "best available technology" requirement of the Deepwater Port Act. We therefore deny the petition for review.

## I. Background

On November 3, 2003, Gulf Landing LLC filed a complete

application with the Secretary of Transportation,[1] pursuant to the Deepwater Port Act, for a license to operate a deepwater port[2] off the coast of Louisiana, 38 miles south of Cameron, described in more detail below. The facility will receive ultra-cooled liquid natural gas, store it, regasify it by heating, and transfer it to existing pipelines for delivery to the Gulf Coast. It will be located in 55 feet of water and will consist of two units fixed to the seabed, including two LNG storage tanks. The LNG will be vaporized using "open rack" vaporizers. This system, known as an "open loop" system, will heat the LNG by pumping warm seawater to the top of each open rack vaporizer and allowing it to flow down panels, in which LNG is flowing through tubes, warming and regasifying the LNG. A "closed loop" system, by contrast, burns natural gas to heat water which is used repeatedly to heat the LNG.

---

[1]The Secretary of Transportation has delegated the licensing authority to the Maritime Administrator, 49 C.F.R. § 1.66(aa)(1)-(2), and various license processing tasks to the United States Coast Guard, 33 C.F.R. § 148.3. Because the Secretary remains ultimately responsible under the Deepwater Port Act, the opinion will refer to actions by the Maritime Administrator and the Coast Guard as actions by the Secretary.

[2]The Deepwater Port Act defines deepwater ports as: "any fixed or floating manmade structure other than a vessel, or any group of such structures, that are located beyond the State seaward boundaries and that are used or intended for use as a port or terminal for transportation, storage, or further handling of oil for transportation, to any State...and for other uses not inconsistent with the purposes of this chapter, including transportation of oil from the United States outer continental shelf." 33 U.S.C. §1502(9)(A).

Because open loop systems require the uptake and release of a large volume of seawater, they affect the marine environment, primarily by entrapping fish, fish eggs, and larvae in the intake screens, decreasing water temperature, and emitting anti-biofouling agents necessary for production into the water. A closed loop system, while more expensive to run, is friendlier to the environment in most respects.[3]

The facility will be located in what the NOAA Fisheries Service has considered the "'fertile fisheries crescent,' the most biologically productive area in the Gulf of Mexico marine ecosystem." Accordingly, the facility will affect many types of animals, including fish, turtles, mammals, and birds. Of primary concern is the red drum, a popular sport-fish not commonly fished commercially. According to the Final Environmental Impact Statement ("FEIS") for the project, the Gulf Landing facility alone could destroy annually a number of red drum equal to 3.8% of Louisiana's annual red drum fish harvest.[4]

Under the Deepwater Port Act, the Secretary has approximately one year after receiving a complete application to issue a decision. 33 U.S.C. § 1504(c)(1),(g),(i)(1),(4). During

---

[3]Apparently, however, open loop systems result in the emission of less air pollution.

[4]As intervenor Gulf Landing points out, this is not to say that 3.8% of the fish will be killed. It also points out that 3.8% is the high end of the estimate, with 0.8% as the average and 0.1% as the low end.

this time, he must take various steps, including conducting an environmental review and issuing an Environmental Impact Statement ("EIS") under NEPA and holding a public hearing. *Id.*

As part of this process, the Secretary published notice of availability of the draft EIS in the Federal Register on June 25, 2004, and issued the 297-page FEIS in November 2004. At the time the FEIS was issued, five other applications had been submitted for similar facilities in the Gulf of Mexico.[5] In following NEPA's mandate that an EIS take into account cumulative effects from "reasonably foreseeable future actions," the Secretary took into account only two of the five pending applications. The Secretary considered the other three applications too speculative, and two of the other three as too geographically distant from the Gulf Landing project as well.[6]

On January 3, 2005, the NOAA Fisheries Service wrote to the Secretary that a license decision without analysis of the cumulative impacts from the other three facilities would not be "adequately evaluated" and that the draft EIS and FEIS should

---

[5]The other applicants included: Port Pelican LLC for a GBS platform; El Paso Energy Bridge Gulf of Mexico LLC for a submerged turret loading system; Freeport McMoRan Energy Main Pass Energy Hub™ for reuse of an existing structure for storage and regasification and for construction of caverns in an underlying salt dome for storage of regasified natural gas; Conoco Phillips Compass Port for a GBS platform; and Exxon Mobile Pearl Crossing for a GBS platform.

[6]Included in the FEIS were the Port Pelican Deepwater Port and the Energy Bridge Deepwater Port.

have analyzed the cumulative impact from those facilities. It also stated in a letter that the open loop system was not the "more environmentally responsible action:" "[a]s we have consistently stated in our previous comments on this project, we are convinced that the use of a [closed loop system] would greatly reduce ecological impacts and yield a stronger, more environmentally responsible action." Louisiana Governor Kathleen Blanco, the Louisiana Department of Wildlife and Fisheries, the Gulf States Marine Fisheries Commission, and the Gulf of Mexico Fishery Management Council expressed the same two concerns in a letter to the Secretary.[7]

Despite these concerns, the Secretary approved the Gulf Landing license on February 16, 2005, subject to certain conditions and environmental monitoring requirements. On April 15, the Petitioners filed a petition in this court, pursuant to the Deepwater Port Act, arguing: (1) that the Secretary should have analyzed the cumulative impact from the other three proposed LNG facilities; and (2) that a closed loop system should have been required for the license to issue.

## II. Standard of Review

When reviewing the adequacy of an EIS, we are mindful that

---

[7]The letter stated: "The level of uncertainty in determining the effects of the open rack vaporizer *is not acceptable*. A comprehensive evaluation incorporating existing data and additional data must be developed. Part of this evaluation should include an assessment of the cumulative impacts of the numerous open rack vaporizers."

NEPA guarantees a process, not a certain result.[8]  As such, this court has set forth three considerations:

> (1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives; (2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involves; and (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

*Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000); *see id.* (Stating that this court "follow[s] a 'rule of reason' and 'a pragmatic standard which requires good faith objectively but avoids 'fly specking'").  "[T]his three-part test is applied under the highly deferential standard of review" set forth in § 706(A)(2) of the APA.  *Avoyelles v. Sportsmen's League v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983).

Under that section, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706; *Citizens for Mass Transit, Inc. v. Adams,* 630 F.2d 309, 313 (5th Cir.

---

[8]*See, e.g., Cal. Save Our Streams Council, Inc. v. Yeutter,* 887 F.2d 908, 910-13 (9th Cir. 1989)(finding that petitioner's independent NEPA claims were subject to the Federal Power Act jurisdictional provision); *City of Tacoma v. Nat'l Marine Fisheries Serv.,* 383 F. Supp. 2d 89, 91-93 (D.D.C. 2005)(dismissing for lack of jurisdiction a challenge under the Endangered Species Act as a collateral attack on a Federal Energy Regulatory Commission license); *Idaho Rivers United v. Foss*, 373 F. Supp. 2d 1158, 1160-61 (D. Idaho 2005)(same).

1980).  "This standard of review is highly deferential,"
*Avoyelles*, 715 F.2d at 904, and we should not substitute our own
judgment for the agency's.  *Kleppe v. Sierra Club,* 427 U.S. 390,
410 n.21 (1976).  "We must look at the decision not as a chemist,
biologist, or statistician that we are qualified neither by
training nor experience to be, but as a reviewing court
exercising our narrowly defined duty of holding agencies to
certain minimal standards of rationality."  *Avoyelles*, 715 F.2d
at 905 (internal quotation marks and citation omitted).

### III. Cumulative Impacts Analysis Under NEPA

We first address Petitioners' contention that the Secretary
failed to adequately consider the cumulative impact of the Gulf
Landing deepwater port with three other ports for which
applications were filed.  Under the Deepwater Port Act,
organizations wishing to construct the type of facility
contemplated here must apply to the Secretary of Transportation
for a license. 33 U.S.C. § 1503(a).  As part of the approval
process, the Act requires the Secretary to prepare an EIS
pursuant to NEPA.  33 U.S.C. § 1504(f).  In accord with NEPA, the
Secretary must include a detailed statement of "the environmental
impacts of the proposed actions."  42 U.S.C. § 4332(2)(C)(i).
Impacts include "ecological...aesthetic, historic, cultural,
economic, social, or health, whether direct, indirect, or
cumulative." 40 C.F.R. § 1508.8.  Cumulative impact "is the

8

impact on the environment which results from the incremental impact of the action when added to other past, present, and *reasonably foreseeable future actions*" and "can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (emphasis added).

When analyzing cumulative impacts of a proposed action, we have held that an agency should consider:

> (1) the area in which the effects of the proposed project will be felt;
>
> (2) the impacts that are expected in that area from the proposed project;
>
> (3) other actions—past, proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area;
>
> (4) the impacts or expected impacts from these other actions; and;
>
> (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Fritiofson v. Alexander,* 772 F.2d 1225 (5th Cir. 1985)(citing *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678, 683-84 (D.C. Cir. 1982)), *overruled on other grounds, Sabine River Authority v. U.S. Dep't of Interior,* 951 F.3d 669 (5th Cir. 1992). Furthermore, this court has held

9

that "[a]n impact is 'reasonably foreseeable' if it is 'sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.'" *City of Shoreacres v. Waterworth,* 420 F.3d 440, 453 (5th Cir. 2005) (citing *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)).

In issuing the FEIS for the Gulf Landing project, the Secretary limited his analysis of "cumulative impacts" to the two ports for which "an approved public Draft NEPA document [was] available for review at the time of the Draft EIS for Gulf Landing". The Secretary therefore did not consider the impact of the three facilities for which applications had been filed but the consideration of the application had not progressed to the draft EIS stage.[9] He reasoned that "[i]t would not be reasonable to speculate on the quantitative or qualitative configurations of an application until an approved public draft evaluation was available for review." He also excluded two of those three ports on the independent rationale that they were too geographically distant from the Gulf Landing port, finding that "[t]he Mississippi River discharge plume is approximately 210 miles east of the [proposed Gulf Landing port] and, in this case, represents a reasonable biological boundary for assessment of cumulative impacts."

---

[9]The Gulf Landing FEIS was published on December 3, 2004. The draft EISs for the other three projects were made available on February 11, 2005, April 21, 2005, and June 17, 2005.

The Petitioners argue that the Secretary's decision to exclude consideration of the three ports for which applications had been filed was arbitrary and capricious. They contend that the effects of the proposed projects are not speculative because the details required in an application give the Secretary ample information to evaluate the effects of the projects.[10]

Appellants also argue that the dire need for natural gas,

[10]The Act requires that applications provide:

(D) the proposed location and capacity of the deepwater port, including all components thereof;
(E) the type and design of all components of the deepwater port and any storage facilities associated with the deepwater port;
(F) with respect to construction in phases, a detailed description of each phase, including anticipated dates of completion for each of the specific components thereof;
(G) the location and capacity of existing and proposed storage facilities and pipelines which will store or transport oil transported through the deepwater port, to the extent known by the applicant or any person required to be disclosed...
...
(K) a description of procedures to be used in constructing, operating, and maintaining the deepwater port, including system of oil spill prevention, containment, and cleanup; and
(L) such other information as may be required by the Secretary to determine the environmental impact of the proposed deepwater port.

33 U.S.C. § 1504(c)(2).

11

the sums expended by the applicants,[11] the expense entailed in preparing such applications, and the financial stability of the applicants make the projects "sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision." *City of Shoreacres,* 420 F.3d at 453.

The Secretary argues that he was not arbitrary or capricious in declining to consider the effects of the three projects for which draft EISs were not available. The Secretary acknowledges that absolute certainty that a project will come to fruition is not required in order to include it in the cumulative impact analysis. He argues, however, that a line must be drawn somewhere, and he has drawn the line such that projects without a final license are to be considered, but only after a draft EIS is available. Specifically, the Secretary contends that the Deepwater Port Act requires so many steps after the filing of an application that until a draft EIS is available, there is insufficient certainty about the project's future construction and environmental consequences to include it in the cumulative impact calculus. He argues that accepting Petitioners' argument would require the Secretary to engage in four "layers of speculation."

First, the Secretary would have to presume that information provided by the applicant is sufficient for consideration,

---

[11]The Gulf Landing facility, for example, would cost around $700 million.

12

without the independent analysis by the Secretary mandated by the Act.  He points out that this analysis is not superficial or perfunctory; for example the Act requires expertise from a number of different agencies.[12]  Second, the Secretary may decide to deny the license or impose conditions on it that alter the project's environmental effects.  He argues that one of the conditions may even be a change from open loop to closed loop technology, or vice-versa, a change with significant environmental effects.[13]  Third, the Act imposes requirements beyond the Secretary's control that may require him to deny or impose conditions on a license.  For example, the license cannot issue if the EPA informs the Secretary that the project does not comply with environmental statutes or if the Governor of the adjacent state timely indicates disapproval.  33 U.S.C. § 1503(c)(8).  Fourth, even if a license issues, the facility may never be built, because of the cost of the project, a volatile market or because of unanticipated conditions the Secretary

---

[12]He offers an example of the Gulf Landing license itself, where after Gulf Landing submitted its application, the Secretary and the Coast Guard determined that it submitted insufficient environmental data and directed it to submit additional data. He also notes that the EPA and NMFS provided important comments before the Draft EIS issued.

[13]Again, he offers as an example the Gulf Landing license itself, which was granted subject to certain conditions, such as technical monitoring requirements allegedly designed to mitigate environmental impacts.

imposes on construction.[14] The Secretary argues that while he could have cast his net wider, it was not arbitrary or capricious for him to cast it where he did because of the above uncertainties.

Finally, intervenor, ConocoPhillips points to the continued monitoring requirements, imposed by the Secretary requiring the operator to mitigate undue environmental damage. Pointing to the short, 356-day window given to the Secretary to act on an application, it also argues that with these time constraints the Secretary could not have taken into account the three speculative ports, and that the Secretary cannot be expected to consider applications filed up until the date it completes its EIS.

We agree that the Secretary did not act arbitrarily or capriciously when he included only two of the five ports for which applications were filed. We recognize the high demand for natural gas and these LNG ports, thereby increasing the *possibility* that the ports will be built. We also recognize that the companies which have filed the applications certainly have the resources to build the ports.

However, the Secretary was entitled to conclude that the occurrence of any one of a number of contingencies could cause the plans to build the ports to be cancelled or drastically

_____

[14]As the Secretary points out, one of the two already licensed projects included in the Gulf Port FEIS is indefinitely on hold.

14

altered.[15] For example, one or more of the applicants may decide for a number of reasons to withdraw its application before the Secretary's approval, such as ExxonMobil did with its application for the Pearl Crossing GBS platform.[16] The Secretary, after receiving input from other agencies, may deny an application or make changes to the application's construction specifications such as demanding that the port be closed loop rather than open loop. The technology in this area is also advancing rapidly and may change the effects of the planned ports. Finally, based on public statements and correspondence from Louisiana Governor Kathleen Blanco, the Secretary was aware that she might well

---

[15]*See Airport Impact Relief v. Wykle*, 192 F.3d 197 (1st Cir. 1999)(concluding that an airport expansion was not reasonably foreseeable because it was "contingent on several events that may or may not occur over an eight-year span" including "the acquisition of permits, the arrangement of funding, the drafting of expansion plans, and other contingencies that must occur before even the trilateral land exchange can occur. These contingencies render any possibility of airport expansion speculative and, . . . neither imminent nor inevitable."). *Cf. Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1215 (9th Cir.1998)(court concluded that a single EIS was required because proposed timber sales were reasonably foreseeable: "they were developed as part of a comprehensive strategy" and they were "disclosed by name to a coalition of logging companies, along with estimated sale quantities and timelines" before the proposed project's environmental assessment was completed).

We also acknowledge the Petitioners' argument that some of these events could happen even after a draft EIS is complete. However, we find the Secretary has wide discretion in determining where to draw the line, that the line must be drawn somewhere, and that he acted within his discretion when he included only projects for which draft EISs were available.

[16]*See* 70 Fed. Reg. 73059 (Nov. 17, 2005).

decide to veto any open loop port approved by the Secretary.[17]

Under the facts presented to us and under the deferential standard which we review the agency's determination, we find that the Secretary did not abuse his discretion or act arbitrarily or capriciously in concluding that the three ports were not "reasonably foreseeable future actions," or, as this court has put it, actions that "a person of ordinary prudence would take [] into account in reaching a decision." *City of Shoreacres,* 420 F.3d at 453.[18]

IV.

We next address Petitioners' argument that the Secretary violated the Deepwater Port Act by issuing a license for a facility that does not require the "best available technology, so as to prevent or minimize adverse impact on the marine environment," as required by the Act.

Under § 1503(c) of the Act, the Secretary "may" issue a license if:

> (2) he determines that the applicant can and will comply with applicable laws, regulations, and license conditions;

[17] After oral argument, but before this opinion issued, Governor Blanco did, in fact, exercise her power to veto the Freeport McMoRan Port—one of the three ports excluded from the cumulative impact analysis.

[18] Because we conclude that the Secretary was not arbitrary or capricious when he excluded potential projects without a completed draft EIS from the Gulf Landing EIS, we need not answer the question whether the Secretary's alternative geographical rationale for excluding two of the ports is valid.

16

(3) he determines that the construction and operation of the deepwater port will be in the national interest and consistent with national security and other national policy goals and objectives, including energy sufficiency and environmental quality;
...

(5) he determines, *in accordance with the environmental review criteria established pursuant to section 1505 of this title*, that the applicant has demonstrated that the deepwater port will be constructed and operated *using best available technology, so as to prevent or minimize adverse impact on the marine environment...*

33 U.S.C. § 1503(c)(emphasis added).

The implementing regulations also provide that the application must use "the best available technology to prevent or minimize adverse impact on the environment."  33 C.F.R. § 148.710(a)(2). The regulation further instructs the Secretary to evaluate "a deepwater port proposal and reasonable alternatives...on the basis of how well they: (a) Reflect the use of best available technology in design, construction procedures, operations, and decommissioning;...(g) avoid interference with biotic populations, especially breeding habitats or migration routes." 33 C.F.R. § 148.725.

The Petitioners argue that the Secretary violated the plain language of subsection (5) by failing to require a closed loop system, a system which would "prevent or minimize adverse impact on the marine environment."  They point out that the Secretary admitted in the FEIS that the open loop system will have a "higher effect" on the "water quality and marine life" than a

17

closed loop system, a conclusion other agencies agree with.[19]

They argue that the FEIS reflects that the Secretary approved

open loop technology because of lower operating costs:

> The Applicant selected [open loop] technology because it is widely used and highly proven technology, is a simple process (highly reliable), and has low fuel-usage requirements and resultant reduced operating costs. The Applicant has also made sound arguments on the basis of safety and availability of means to ensure protection of environment.

Thus, appellants argue that because the open loop system is

more harmful to the environment than the closed loop system, the

Secretary's approval of a port with an [20] open loop system was

"contrary to law" under § 706(2)(A) of the APA.

The Secretary argues that the Congressional directive to

require the applicant to demonstrate it will construct the port,

using the best technology "so as to prevent or minimize adverse

impact on the marine environment" is best read to require

construction that reasonably minimizes adverse impact to a

reasonable degree given all relevant circumstances. He also

contends that the Petitioners' reading ignores the prior clause

in subsection (5)—"in accordance with the environmental review

---

[19]The NMFS stated that it was "convinced that the use of a [closed loop system] would greatly reduce ecological impacts and yield a stronger, more environmentally responsible action." The Gulf States Marine Fisheries Commission and the Gulf of Mexico Fishery Management Council stated that the open loop system "will have unacceptable negative impacts on fishery stocks" and that "[a closed loop system] should have been fully analyzed."

[20]*See* 70 Fed. Reg. 73059 (Nov. 17, 2005).

criteria established pursuant to 33 U.S.C. § 1505".  The

Secretary points out that § 1505 requires the Secretary to

consider broad criteria other than marine environment;[21] he

argues that the Petitioners would have him ignore these criteria

entirely whenever a technology marginally better for the marine

environment is worse for the rest of the environment.

The Petitioners' reading of the subsection at issue in

isolation cannot be correct.  First, under the Petitioners'

reading, the Secretary could not apply the overall environmental

criteria of § 1505, which is mandated by subsection (5) itself.

Second, under petitioner's reading, the Secretary could not

properly follow NEPA, as mandated by subsection (5) and § 1505,

because he would have to ignore NEPA-mandated variables not

---

[21]Section 1505 expressly provides that the Secretary "shall establish. . . environmental review criteria consistent with the National Environmental Policy Act" and that "[s]uch criteria shall be used to evaluate a deepwater port as proposed in an application, including—
      (1) the effect on the marine environment;
      (2) the effect on oceanographic currents and wave
      patterns;
      (3) the effect on alternate uses of the oceans and
      navigable waters such as scientific study, fishing, and
      exploitation of other living and nonliving resources;
      (4) the potential dangers to a deepwater port from
      waves, winds, weather, and geological conditions, and
      the steps which can be taken to protect against or
      minimize such dangers;
      (5) effects of land-based developments related to
      deepwater port development;
      (6) the effect on human health and welfare; and
      (7) *such other considerations as the Secretary deems
      necessary or appropriate.*

33 U.S.C. § 1505(a)(1)-(7) (emphasis added).

related to the marine environment. *See, e.g.,* 33 U.S.C.A.§ 4331(b)(5) (requiring the federal government to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities."). Third, the Petitioners' reading would prevent the Secretary from considering the factors in subsection (3): whether the license was in the "national interest" and good for "energy sufficiency and [overall] environmental quality." 33 U.S.C. § 1503(c)(3). The Secretary's cost-analysis of the technology also complies with Congress' intent to "promote the construction and operation of deepwater ports as a safe and effective means of importing oil or natural gas into the United States." 33 U.S.C. § 1501(a)(5). As the Secretary points out, this goal would be compromised if the "best available technology" requirement demanded the use of the technology that is best for the marine environment, even if the costs were so prohibitive that no applicant could ever construct a port using that technology.

For these reasons, we conclude that the Secretary's issuance of the Gulf Landing license was not contrary to law.

Petition for review DENIED.